# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| NACHURS ALPINE SOLUTIONS, CORP., <br><br> Plaintiff, <br><br> vs. <br><br> BRIAN K. BANKS and NUTRA-FLO COMPANY, <br><br> Defendants. | No. 15-CV-4015-LTS <br><br> **ORDER** |

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1
II.  BACKGROUND .................................................................................. 2
III. PLAINTIFF'S MOTION TO COMPEL ................................................... 3
     A. The Standard ............................................................................... 3
     B. Defendants' Answers to Discovery v. ESI Documents ........................... 4
IV.  PLAINTIFF'S MOTION FOR SANCTIONS ............................................ 14
V.   CONCLUSION .................................................................................. 19

## *I.     INTRODUCTION*

This matter is before the Court pursuant to plaintiff's resisted motion to compel and impose sanctions. (Doc. 98). Plaintiff argues that defendants' discovery responses were deficient and in some cases misleading and false, and seeks sanctions in the form of attorneys' fees and other sanctions. On June 12, 2017, the Court heard oral argument

1

from the parties on plaintiff's motion. For the reasons that follow, the Court grants plaintiff's motion to compel and impose sanctions.

## II. BACKGROUND

On March 10, 2015, plaintiff filed suit against defendants in this Court. (Doc. 2). Plaintiff and defendant Nutra-Flo Company ("Nutra-Flo") are competitors engaged in the business of manufacturing and selling fertilizer. Plaintiff's complaint alleged, generally speaking, that its former employee, defendant Brian Banks ("Banks"), took confidential, proprietary, and trade secret information from plaintiff and provided that information to his new employer, defendant Nutra-Flo. After litigation regarding a preliminary injunction, defendants filed an answer on April 15, 2015, generally denying all allegations. (Doc. 27).

Discovery followed during which plaintiff propounded interrogatories and requests for production of documents seeking to discover, among other things, what information Banks took from it, what information he provided to Nutra-Flo, what role Banks had in research and development of products at Nutra-Flo, and requesting the production of documents reflecting all this. The parties also entered into a stipulated preliminary injunction that, among other things, required defendants to return to plaintiff any confidential or trade secret documents Banks removed from plaintiff.

Eventually, in March and April of this year, defendants produced a significant amount of electronically stored information (ESI). In combing through those tens-of-thousands of pages of documents, plaintiff states it found documents that demonstrate that defendants' answers to interrogatories were, at best, deficient. Plaintiff argues that defendants had an obligation to supplement their answers and provide the information plaintiff obtained only after incurring the expense of obtaining and examining the ESI documents. Defendants argue that their answers to discovery were not deficient, and alternatively that sanctions are inappropriate because plaintiff obtained the information

through production of the ESI documents in any event, and because defendants acted in good faith and exercised reasonable efforts to comply with plaintiff's discovery requests.

### III. PLAINTIFF'S MOTION TO COMPEL

#### A. The Standard

In analyzing the merits of plaintiff's motion to compel, the Court begins with looking at the Federal Rules of Civil Procedure regarding the scope of discovery and the obligation of the parties. Rule 26(b)(1) of the Federal Rules of Civil Procedure provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1). Rule 26(b) is widely acknowledged as "liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) (internal citation omitted). Parties must answer interrogatories as fully and completely as possible. *Motorola, Inc. v. Alexander Mfg. Co.*, No. 90-3062, 1991 WL 325499 (N.D. Iowa Dec. 30, 1991). In the event a party is unable to supply a complete answer, the party is required to furnish any relevant information available. *Id*.

Furthermore, parties have an ongoing obligation to supplement discovery answers in a timely manner. Federal Rule of Civil Procedure 26(e) provides, in pertinent part:

> **(e) Supplementing Disclosures and Responses.**
> **(1) In General.** A party who has made a disclosure under Rule 26(a)— or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

3

> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
> **(B)** as ordered by the court.

FED. R. CIV. P. 26(e)(1).

### B. Defendants' Answers to Discovery v. ESI Documents

In this case, plaintiff alleges that a number of defendants' answers to interrogatories and requests for production of documents were inaccurate, misleading, or false and that defendants failed in their duty to supplement discovery responses. The Court will discuss each of these categories in turn.

<u>Banks' Involvement in Research and Development</u>

Several of plaintiff's discovery requests focused on finding out the extent to which Banks was involved in research and development at Nutra-Flo. Given plaintiff's fear that Banks made off with confidential business information and trade secrets to a competitor, it follows that knowing the extent to which Banks was involved in developing products to compete with his former employer was a key area of interest. In the first set of interrogatories to Banks, Interrogatory 3(b) asked Banks to:

> Describe in detail what you told representatives of Nutra-Flo or The Andersons[1] about your work at Nachurs or about Nachurs products, marketing, customers, or research and development, after you were hired.

(Exhibit 2, at 4).

Banks answered:

> I did mention to Nutra-Flo the name of Bob Skorupa, a one-time customer of Nachurs. I was contacted by a former district sales manager for Nachurs, after I had left Nachurs, who said I should give Mr. Skorupa a call. I was

---

[1] The Andersons is a company that acquired Nutra-Flo after Banks became a Nutra-Flo employee.

> also contacted by Dave Rickett and Jere Long, former Nachurs' employees, who said they wanted to have a discussion with someone from Nutra-Flo. I passed their names along, too.

(*Id*.). Banks mentioned nothing about research and development. Nutra-Flo was asked a similar question and provided a similar answer. (Exhibit 1, at 4-5).

In the second set of interrogatories, in Interrogatory No. 5, plaintiff asked Banks to describe in detail the responsibilities he had at Nutra-Flo for "developing new and innovative products."[2] (Exhibit 4, at 4).

Banks responded:

> I am not responsible for the research and development of new products. I am one member of a committee that considers new products. As part of this team, I evaluate new product ideas. I provide input to the committee on what potential new products might work or be successful.

(Exhibit 4, at 5).

In the second set of interrogatories, in question 6, Banks was asked to identify and describe in detail how [he] can perform his duties at Nutra-Flo without utilizing or otherwise disclosing [plaintiff's] confidential, proprietary, and trade secret information . . . .(Exhibit 4, at 5).

Banks replied:

> During my employment with [plaintiff], I was never made aware of any proprietary information that I need to use or that I do use in performing my duties for Nutra-Flo. The formulas for the products I deal with today are basic chemistry that I learned through my education, not through my employment with [plaintiff].

(Exhibit 4, at 5).

---

[2] Plaintiff based the wording of this interrogatory on a Nutra-Flo press release that indicated Banks would "play an important role in the development of new and innovative products." (Doc. 98-5, at 4).

5

Nutra-Flo provided a similar answer to a similar interrogatory (No. 7, in the second set of interrogatories). (Exhibit 3, at 5-6). In particular, Nutra-Flo answered:

> Brian Banks has never been asked and will never be asked to disclose any trade secret information of [plaintiff]. Brian Banks is not involved in researching and developing new products. Brian promotes Nutra-Flo's existing products and provides technical support to customers, growers and the sales staff. None of Brian's duties require him to use any confidential information he may have learned while employed by [plaintiff].

(Exhibit 3, at 6).

Plaintiff went on, in Interrogatory 7, to ask Banks to: "Please describe in detail all responsibilities you have had since joining Nutra-Flo regarding potassium acetate fertilizer [and a listing of "formulas and analyses"]." (Exhibit 4, at 5-6). After lodging objections, Banks answered "none," and further averred: "I have had no involvement whatsoever of any type with regard to potassium acetate [and the other analyses]." (Exhibit 4, at 6). In a supplemental response, Banks stated that he was "aware" of "planned field tests . . . involve[ing] mixing potassium acetate with other formulas but [he] was not responsible for any such testing." (Exhibit 7, at 4).

In responding to requests for production of documents regarding Banks' involvement with research and development at Nutra-Flo, Banks stated he had no "documents evidencing research and/or communications regarding the use of potassium acetate as a potassium source for any fertilizer product of Defendants." (Exhibit 5, at 4 (Request No. 8)). Banks similarly replied that he had no documents in his possession from his employment with plaintiff relating to "potassium liquid fertilizer research and data as well as the testing/results of [plaintiff's] fertilizer products in combination with pesticides, herbicides, fungicides, insecticides, etc." (Exhibit 5, at 9 (Request No. 28)). Nutra-Flo provided similar responses to similar requests. (Exhibit 6, at 4 (Request No. 8); Exhibit 12, at 3 (Request No. 38)).

6

From the ESI, however, plaintiff uncovered documents that demonstrate that these discovery responses were deficient. Banks was employed as an agronomist with plaintiff and was allegedly aware of and had access to information about plaintiff's manufacture and marketing of fertilizers containing potassium acetate. Banks submitted his resignation to plaintiff on January 23, 2015, effective February 6, 2015. (Doc. 2, ¶58). Banks began working for Nutra-Flo on February 9, 2015. (Doc. 2, ¶70). On February 27, 2015, Jason Glover, Director of Product Strategy, Marketing and Business Development at Nutra-Flo, sent an email to banks asking:

> How much KOH is in Bio K? We are wondering if we can blend it down to reduce the acedic acid and reduce flammability while dropping the freezing temp.

(Exhibit 25). "KOH" is a reference to a form of potassium acetate. "BIO-K® is a registered U.S. Trademark of NAS, Registration No. 4,668,920, registered January 6, 2015, on the Supplemental Register for Fertilizers Containing Potassium; Fertilizers Containing Potassium for Agricultural Use, in International Class 001, US Classes 1, 5, 6, 10, 26 and 46." (Doc. 2, ¶21). On March 3, 2015, at approximately 3:35 PM, Banks retrieved from a Dropbox (where he stored electronic documents from his employment with plaintiff) a PowerPoint entitled "The Bio-K Concept." (Exhibit 27). Glover forwarded the PowerPoint presentation to Mark Samuelson, Director of New Product Development for Nutra-Flo, in an email on the same date at approximately 8:30 PM, stating: "Here is a little background and sales material on a competitive KA product." (Exhibit 28). On the same date, at approximately 11:09 PM, Glover sent an email to Samuelson, Banks, and Terry Robinson regarding "KA Discussion," stating:

```
An initial Agenda.

Competitors??? products  - Brian and Mark provide overview
Sales and Marketing Desires ??? group discussion based
Ideas and Concepts ??? Terry and Group discussion on opportunities and potential
Sample availability ??? competitors??? samples to look at ???  We can discuss.
Research plans ??? need samples
```

(Exhibit 20, at 1). The meeting was scheduled for March 11, 2015, in the Lab Conference Room. (*Id*., at 2). On March 5, 2015, Glover sent an email to Samuelson, stating: "I recall—Brian told me that Nachurs uses 25-30% Dry KOH. ???"[3] (Exhibit 26). The next day, Banks sent an email to Glover identifying a potential source for KA, whom he identified as "A competitor of [plaintiff]." (Exhibit 20, at 5). On March 24, 2015, Glover, Banks, and others engaged in an exchange of emails discussing formulas for fertilizer, including the use of potassium acetate. (Exhibit 20, at 10-18). Finally, in an email exchange on March 25, 2015, Banks, Glover, and others discussed formulas for making a fertilizer. Glover ended the exchange by announcing "I will let Brian take the lead on the formulation," noted that "this is just for some in ground <u>research</u>" and "it is strictly for product <u>development</u>." (Exhibit 20, at 7-9 (emphasis added)).

In Banks' deposition testimony, he admitted that the amount of KOH in plaintiff's Bio-K is not public knowledge and he believed it was a trade secret. (Exhibit 23, at 143-44). Regarding the PowerPoint, Banks acknowledged that it was plaintiff's PowerPoint, that it is about plaintiff's Bio-K, and agreed that the PowerPoint was a trade secret. (Exhibit 23, at 145-46). In Glover's deposition, he testified that he believed Banks could provide the amount of KOH in plaintiff's Bio-K based on public knowledge or off the label. (Doc. 108-1, at 4). If that is the case, it begs question of why Glover would need to ask Banks, a former employee of plaintiff, for the information if it was in the public domain. Nevertheless, even if Glover thought it was not a trade secret, Banks apparently knew it was.

On March 11, 2015, Banks shared with Glover confidential, unpublished field trial results, and Glover recognized the document as proprietary. (Exhibit 18, at 37-40). The documents show an email from Banks to Glover that referenced an attached "interesting

---

[3] It appears to the Court that the triple question marks that appear in some emails are a product of a glitch in the printing of ESI documents and have no significance.

article on potassium." (Exhibits 18 & 19). On March 12, 2015, Glover asked Banks in an email if it was public information because if not "we should not be sharing it as it is proprietary in nature." (Exhibit 18, at 37). The documents provided to the Court do not contain a response. And indeed, from the documents themselves the Court cannot determine what was attached and whether it was proprietary. Fortunately, this was clarified in Banks' deposition, where he testified that the attachment was plaintiff's field trial results that were not public and were proprietary in nature.[4] (Exhibit 23, at 3-5 (pages 52-58 of Banks' deposition transcript). Banks testified that he thought the results were public because prior years' test results had been published. Be that as it may, Banks testified that after he received the email from Glover he determined the information was not public. Whether his disclosure of the trade secret to Nutra-Flo was a violation of law is not the issue. Banks was required to provide discovery responses revealing that he disclosed this trade secret, regardless of whether he believed he had a justification for doing so.

In the second set of interrogatories, plaintiff asked Nutra-Flo to, among other things, identify "individuals who worked on researching and developing" using potassium acetate as a potassium source for fertilizer products. (Exhibit 3, at 8-9 (Interrogatory No. 11)). Nutra-Flo identified only Doyle Meeker and Dirk Lohry. (Exhibit 3, at 9). The email exchanges reflected in Exhibits 18, 19, 20, 25, 26, 27 & 28, however, show that Banks, Glover, Samuelson, Robinson, Jessi Vetos, Jeff Eells, Kelli Barnett, Dennis Zabel, and Vice President Ed Ummach were all involved in discussing and working on the research and development of such products.

---

[4] In Banks' deposition plaintiff's counsel showed him an exhibit marked 43. The Court was not provided with that exhibit, but it appears based on Bates numbers and other references in the deposition transcript that parts of Exhibit 18 constituted deposition exhibit 43. It would have been helpful to the Court had plaintiff provided the Court with the same exhibit it provided to Banks so the Court could more easily track the deposition testimony.

Defendants assert that Banks' involvement in providing the amount of KOH in Bio-K, recommending sources for potassium acetate, contacting contractors to conduct field trials, participating in meetings about those field trials, and taking the lead in determining how much acetate to add to the product in light of cost considerations, did not mean he was involved in research and development of fertilizers containing potassium acetate. (Doc. 108, at 3-9). The Court disagrees. He was involved at least enough to have been disclosed in answers to plaintiff's interrogatories. Some of the emails discussed above specifically reference research and development of the product. A simple word search of emails using those words and Banks' name would have disclosed it. Defendants assert that Barnett and Zabel were simply agronomists, and therefore not involved in research and development because they were only involved in "field testing products that had already been developed." (Doc. 108, at 9). This strikes the Court as nonsensical; by its very nature, field testing of a product is part of its development. Defendants excuse failing to identify Glover and Samuelson because they disclosed those names as people with discoverable information about Nutra-Flo's development of fertilizer using potassium acetate. (Doc. 108, at 10). That may be, but they should have been included in response to Interrogatory No 11 as well. Defendants argue they did not have to disclose Vetos or Eells because they were only involved in determining if the product could be manufactured and the costs of production. (Doc. 108, at 10). At the hearing, defense counsel conceded, however, that determining the ability to manufacture a product and the costs of manufacturing a product are naturally parts of the development of a product.

In summary, based on the Court's review of plaintiff's interrogatories and requests for production of documents, defendants' answers to the same, and the documents obtained from the ESI, the Court finds defendants' answers to plaintiff's discovery requests were deficient and were, at the very least, not accurate and in many ways

misleading regarding Banks' and others' involvement in the research and development of fertilizer containing potassium acetate. It is apparent that Banks was involved in the research and development, or at least the development, of fertilizer products for Nutra-Flo using potassium acetate. The same is true of all of the other people involved in the various email communication in February and March 2015 discussing developing a fertilizer using potassium acetate.

Banks' Transfer of Research and Development Documents to a Hard Drive

Plaintiff argues that defendant Banks provided inaccurate answers to discovery requests regarding disclosing what documents Banks downloaded onto an external hard drive from plaintiff's computers. In response to a request for admission, Banks denied he has "transferred to an external hard drive documents and electronic records belonging to Nachurs regarding Nachurs research and development work." (Exhibit 14, at 2). Banks also stated in response to Interrogatory 6 (in reference to that request for admission) that he "did not download any information regarding Nachurs' research and development work." (Exhibit 2, at 5).

The ESI documents show Banks had downloaded files from plaintiff's computers to an external hard drive and transferred documents to a Dropbox. (Exhibits 21 & 27). It is not clear what was loaded onto the hard drive. Banks testified that the hard drive was broken, and the whereabouts of the hard drive is apparently unknown. (Exhibit 23, at 7). It is clear that Banks uploaded a PowerPoint on Bio-K to a Dropbox, and he has admitted that the PowerPoint was a trade secret, and the Court has found that PowerPoint involved research and development. The discovery requests were limited, however, to inquiries about downloading documents to a hard drive specifically, not uploading documents to a Dropbox.

Therefore, the Court finds that defendants' answers to these discovery requests were not deficient.

### Banks' Transfer of Documents to a Dropbox

Plaintiff alleges that Banks provided inaccurate discovery responses regarding documents he "sent to or received from" a Dropbox. (Exhibit 16, at 3 (Request No. 43)). Banks referred plaintiff to his answer to Interrogatory No. 25. (*Id*.). In answer to Interrogatory No. 25, Banks identified some files and documents, but did not mention the PowerPoint on Bio-K or plaintiff's proprietary 2014 field test results. (Exhibit 13, at 7). Banks also produced "over 400 pages of documents from his Dropbox," but none of them included the Bio-K PowerPoint or the field test results. (Doc. 98-1, at 10). It is clear to the Court that Banks' response to this discovery request was deficient. Banks argues that he simply forgot. (Doc. 108, at 16). No showing has been made regarding what efforts he and defense counsel undertook to ensure that he would not forget something like providing proprietary information to his new employer. The Dropbox was a subject of the stipulated restraining order. Reasonable efforts in answering discovery regarding the Dropbox would have involved accessing the Dropbox and the screenshots taken of the Dropbox at the time of the stipulated restraining order to preserve the evidence. Apparently that was not done. Banks later deleted those two documents from the Dropbox and argues he could not produce what he did not have. While that is axiomatic, he should have identified what he had deleted and disclosed this information in response to discovery requests by comparing the documents in the Dropbox with the screenshot of the files that were in the Dropbox before he deleted them. The fact that Banks deleted these two documents, which he admitted were trade secrets, detracts from his explanation that he did not recall these documents. But it is difficult for the Court to make a judgment regarding Banks' credibility as he did not testify before the Court.

In summary, the Court finds that Banks' responses to these discovery requests were deficient.

Banks' Disclosure of Customer Leads

Plaintiff alleges that Nutra-Flo's response to Interrogatory No. 3(h) asking "what Brian Banks told Nutra-Flo about his work at Nachurs or Nachurs' . . . customers . . . after he was hired" was deficient. (Doc. 98-1, at 10). In response to this question, Nutra-Flo responded that Banks had provided the name of one customer and the names of two former employees of Nachurs. (Exhibit 1, at 5). Interrogatory No. 10 asked Banks to provide information about customers he brought to Nutra-Flo. (Exhibit 4, at 8). He provided no additional information. (*Id.*).

The ESI document included an email dated February 13, 2015, in which Banks provided Lisa Dodge of Customer Support the names of four people, two of which Nutra-Flo identified in response to Interrogatory No. 3(h). (Exhibit 22, at 4). The two names not disclosed were Ronnie Hohlen and Dave Hoffman. In response to Banks' email, Dodge asked "Where are these leads from? What type of leads are they?" (Exhibit 22, at 3). Banks responded: "They are all people I know that have called me and are interested in buying fertilizer." (*Id.*).

Nothing has been provided to the Court establishing that Hohlen and Hoffman were customers of plaintiff. Indeed, the evidence before the Court suggests otherwise, as Banks testified that he did not believe either were customers. The Court cannot find that based on the record before it that Nutra-Flo's answer to Interrogatory No. 3(h) is deficient. Similarly, based on this record the Court cannot find that Banks' response to Interrogatory No. 10 was deficient because there is nothing in the record before the Court establishing that Banks "brought in" any customers.

Therefore, the Court finds defendants' responses to these discovery requests were not deficient.

## IV.    PLAINTIFF'S MOTION FOR SANCTIONS

Having found that certain of defendants' responses to plaintiff's discovery requests were deficient, the issue now before the Court is whether the Court should impose sanctions against defendants for violating discovery rules. Plaintiff requests the Court impose sanctions in the form of "attorney's fees, shifting the cost of retaking Dennis Zabel's, Raun Lohry's, and Ed Ummach's depositions, shifting the fees for ESI already performed and the attorney's fees involved in reviewing ESI to Defendants, shifting the cost of future ESI to Defendants, and requiring Defendants to pay for the next round of ESI." (Doc. 98-1, at 19). Plaintiff also requests the Court compel defendants "to provide read-only access to the documents in Banks' Dropbox." (*Id.*). Plaintiff argues the Court should impose sanctions based on its authority pursuant to Federal Rules of Civil Procedure 26(g)(3) and 37(b), and pursuant to the Court's inherent power. (Doc. 98-1, at 11-19).

The Court's authority to sanction the misconduct of parties and their attorneys is derived from the Federal Rule of Civil Procedure and the inherent power of the court. *See* FED. R. CIV. P. 11, 26, & 37; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 280 (8th Cir. 1995). Federal Rule of Civil Procedure 26(g)(3) provides that a court "must" impose sanctions "[i]f a certification violates this rule without substantial justification." FED. R. CIV. P. 26(g)(3). The rule provides that a court may impose the sanction "on the signer, the party on whose behalf the signer was acting, or both." (*Id.*). The rule further provides that "[t]he sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." (*Id.*). Federal Rule of Civil Procedure 37(c)(1) provides for applicable sanctions to be imposed in the event a party does not make the required disclosures under Rule 26. Rule 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

FED. R. CIV. P. 37(c). The Court, of course, also possesses inherent power to impose sanctions in matters arising from discovery abuses. *See Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 280 (8th Cir. 1995).

The Court has broad discretion to shape an appropriate remedy, including entering default judgment, striking pleadings, providing an adverse jury instruction, and awarding attorney's fees and costs. *See Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 745–46 (8th Cir. 2004). The most severe sanctions are reserved for those litigants demonstrating "'blatant disregard of the Court's orders and discovery rules [and] engaging in a pattern of deceit by presenting false and misleading answers and testimony under oath in order to prevent their opponent from fairly presenting its case." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).

The Court provided defendants an opportunity to be heard regarding their failure to provide adequate responses to the plaintiff's discovery requests. After considering the evidence and argument, the Court concludes that defendants' failures to provide complete and accurate discovery responses, or to timely supplement those responses, were not substantially justified. Defendants' responses regarding Banks' alleged lack of involvement in research and development are particularly egregious. The very email traffic involving and including Banks is replete with wording explicitly discussing researching and developing a fertilizer with potassium acetate. The Court takes no position on whether, in the end, Banks disclosed trade secrets to Nutra-Flo or whether,

if he did so, there was an excuse or a justification amounting to a defense. What is clear, however, is that there can be no genuine dispute that Banks was involved in providing information and working with others at Nutra-Flo to develop a fertilizer with potassium acetate. And his involvement was significant enough that the Court finds it inexcusable for defendants to have denied that involvement or to claim ignorance of his involvement.

A simple word search on defendants' emails would have revealed the information sought by plaintiff in its discovery requests. The same can be said about Banks' uploading of documents to his Dropbox. Defendants had the Dropbox and the screenshot of the Dropbox contents available to them when answering the discovery requests. They were obligated to search it when asked the simple request to produce copies of documents Banks uploaded into the Dropbox. Defendants' responses to these discovery requests have indicia of intentionality; it appears, in short, to be a case that defendants decided to deny facts and failed to disclose information that could be injurious and hoped that plaintiff did not discover that information in the vast volume of discovery involved in this case. In summary, the Court concludes that defendants' failure to comply with Rule 26 was not substantially justified.

The next question is whether the failure to provide complete and accurate discovery responses was harmless. "'The burden of proof is on the potentially sanctioned party to prove harmlessness or justification.'" *Cooper v. Wullweber*, No. C10-1032, 2012 WL 1904806, at *6 (N.D. Iowa May 25, 2012) (quoting *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 913 (N.D. Ohio 2008) aff'd, 606 F.3d 262 (6th Cir. 2010)). Defendants argue that the failure is harmless because plaintiff ultimately discovered the documents by searching through the ESI disclosures. The Court finds that defendants have failed to carry their burden of showing that the failure to provide accurate answers in discovery or to timely supplement and correct those inaccurate answers was harmless. Plaintiff has been harmed by incurring significant costs and expenses in

ferreting out the documents that demonstrated the inaccuracies of the discovery responses, and plaintiff will incur additional expenses in conducting further depositions of witnesses already deposed before plaintiff uncovered these documents. Therefore, the Court finds that defendants' failure to comply with Rule 26 was not harmless.

Having found that defendants have shown neither substantial justification for failing to comply with their discovery requirements, nor that the failure was harmless, the Court must now determine the appropriate sanction. Rule 37(c)(1) provides a district court with discretion in fashioning an appropriate sanction, taking into account the circumstances of the case. In fashioning an appropriate remedy, a court should consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (citing *Marti v. City of Maplewood*, 57 F.3d 680, 683 (8th Cir. 1995) (setting forth a variety of possibly relevant factors)).

The Court has already discussed the reason for noncompliance as unacceptable and inexplicable. It amounts to a claim that defendants just did not think what Banks was doing was research and development and, with respect to the Dropbox documents, Banks allegedly forgot about the documents and the defendants did not think to look at the documents actually preserved to find the documents requested. The Court has also addressed the issue of prejudice above. Plaintiff has incurred expenses in finding information and documents that should have been provided by defendants, and in bringing this motion to compel. The Court further finds that the information defendants failed to disclose was very important; indeed, it goes to the heart of the matter in dispute in this lawsuit. In assessing the propriety of sanctions here, the Court concludes that the defendants, and not their attorneys, are primarily responsible for the failure to provide proper discovery responses.

As noted, plaintiff requests the Court impose a variety of sanctions. The Court finds some appropriate and others excessive. The Court finds it is appropriate to impose a sanction in the form of attorneys' fees, shifting the cost of retaking Dennis Zabel's, Raun Lohry's, and Ed Ummach's depositions. Plaintiff shall be permitted to retake these depositions and defendants shall pay plaintiff's attorneys' fees and the costs of the depositions.

As to plaintiff's request for shifting the fees for ESI already performed and the attorneys' fees involved in reviewing ESI to defendants, the cost of future ESI discovery to defendants, and for the next round of ESI, the Court finds this sanction is excessive and too speculative. Although it was necessary for plaintiff to conduct the ESI search to find the documents at issue here, plaintiff would have conducted a similar search regardless out of simple due diligence. There is no basis for the Court to parse out to what extent plaintiff's ESI discovery expenses would have been decreased had defendants provided complete and accurate answers to discovery requests. With regard to future ESI discovery, there is no basis for the Court to determine what that discovery will entail, or to what extent it will relate to defendants' discovery abuses here. The remedy should be tied to the harm and the Court cannot adequately or accurately do so with regard to the ESI discovery.

The Court does grant plaintiff's request to compel defendants to provide read-only access to the documents in Banks' Dropbox. Defendants shall do so within 14 days of this order.

The Court finds other sanctions appropriate as well. Defendants shall pay plaintiff's attorneys' fees and costs incurred in bringing and litigating the instant motion. Within 14 days of this order, plaintiff shall submit to the Court an itemized accounting of those attorneys' fees and expenses. Defendants shall have 14 days from submission

of the accounting to lodge any objections, and plaintiff shall have 7 days after that to file any reply.

Further, the Court orders defendants to supplement their answers to the discovery requests where the Court found their answers to be deficient. The Court is not persuaded that plaintiff has been put in the same place by finding the documents at issue by combing through the ESI discovery. Plaintiff is entitled to accurate answers to its discovery requests in the form made. Indeed, although plaintiff may have uncovered some documents in the ESI disclosures that provide some additional answers to the discovery requests already made, it may not have uncovered everything known to, or with reasonable effort that should be known to, defendants. Accordingly, defendants have 14 days from entry of this order to provide supplemental answers to the discovery requests the Court found deficient above.

## V. CONCLUSION

For the reasons discussed above and as set forth herein, the Court **grants** plaintiff's motion to compel and impose sanctions. (Doc. 98).

**IT IS SO ORDERED** this 22nd day of June, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa